UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Mark Vancleave,

        Plaintiff,

    v.

Minnesota Department of Public Safety
Commissioner John Harrington, *in his
individual and official capacities*;
Minnesota State Patrol Colonel Matthew
Langer, *in his individual and official
capacities*; Major Joseph Dwyer, *in his
individual capacity;* and John Does 1-4,
*in their individual capacities*,

        Defendants.

Case No. 22-CV-2812

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

---

## INTRODUCTION

Plaintiff Mark Vancleave is a Minnesota photojournalist who works for the Star Tribune. In April 2021, Vancleave was covering the Daunte Wright protests in Brooklyn Center, Minnesota, when he was shot with a 40mm less-lethal weapon with no warning by a Minnesota State Patrol trooper, despite being clearly identifiable as a member of the press. The 40mm round fractured Vancleave's right hand in several places, requiring surgery. Vancleave suffered permanent injury to his right hand as a result of this assault by the Minnesota State Patrol. He underwent months of painful physical therapy to try and restore some of the function to his hand, with only partial success. He continues to suffer

chronic pain and impaired use of his hand.  The State Patrol's unwarranted attack inflicted great injury, pain, and suffering on Vancleave, and this lawsuit seeks compensation for the damage done.

## PARTIES

1.     Plaintiff Mark Vancleave is a Minnesota resident.   Vancleave is a photojournalist who works for the Minneapolis Star Tribune.  He was on assignment covering the Daunte Wright protests in Brooklyn Center, Minnesota on April 12, 2021, when he was shot in the hand with a 40mm "less-lethal" crowd control weapon by John Doe 1, a Minnesota State Patrol Trooper.

2.     Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol.  Commissioner Harrington is a Minnesota resident.  At all times relevant, Commissioner Harrington was one of the chief policymakers of the Minnesota Department of Public Safety and the Minnesota State Patrol. At all times relevant, Commissioner Harrington ordered, authorized, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Commissioner Harrington was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Department of Public Safety.  Commissioner Harrington is sued in his individual and official capacities.

3.     Defendant Colonel Matthew Langer commands the Minnesota State Patrol. Colonel Langer is a Minnesota resident.  At all times relevant, Colonel Langer was one of the chief policymakers of the Minnesota State Patrol. At all times relevant, Colonel Langer

ordered, authorized, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Colonel Langer was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Department of Public Safety. Colonel Langer is sued in his individual and official capacities.

4.     Defendant Major Joseph Dwyer is a Major in the Minnesota State Patrol and a Minnesota resident. Major Dwyer commands the State Patrol's Mobile Response Team, which engages in crowd control activities and protest responses, and is primarily responsible for the use of chemical agents and less-lethal weapons during protest responses. At all times relevant, Major Dwyer ordered, authorized, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Major Dwyer was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Department of Public Safety. Major Dwyer is sued in his individual capacity.

5.     Defendant John Doe 1 is the unidentified Minnesota State Patrol Trooper who shot Vancleave with the 40mm less-lethal weapon. On information and belief, John Doe 1 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 1. At all times relevant, John Doe 1 was acting under color of state law. John Doe 1 is sued in his individual capacity.

6.     Defendants John Does 2-4 are Minnesota State Patrol Troopers and/or Officers who supervised John Doe 1 and at all times were acting under color of state law, within the course and scope of their official duties and in accordance with the customs,

3

practices, and policies of their employing agency. On information and belief, John Does 2-4 are Minnesota residents. Defendants solely possess the information necessary to identify John Does 2-4. John Does 2-4 are sued in their individual capacities.

## JURISDICTION AND VENUE

7.      Plaintiff's claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

8.      Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiff's claims arise under the United States Constitution and federal law.

9.      This Court has supplemental jurisdiction over the included Minnesota state law claims pursuant to 28 U.S.C. §1367.

10.      Venue is proper in this district under 28 U.S.C. § 1391, as Defendants reside in this district, and the events or omissions giving rise to the claims set forth herein occurred in this district.

11.      Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## THE DAUNTE WRIGHT KILLING AND RESULTING PROTESTS

12.      On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright, an unarmed Black man, during a traffic stop purportedly initiated because of Wright's expired automobile tabs.

13.      The killing of Daunte Wright generated large protests against law enforcement violence and discrimination. These protests occurred primarily outside the

4

Brooklyn Center City Hall where the Brooklyn Center Police Department is headquartered and continued through April 17, 2021.

14.     The Minnesota State Patrol provided law enforcement resources in response to the Daunte Wright protests in Brooklyn Center, including troopers armed with so-called "less-lethal" crowd control weapons.

15.     On April 12, 2021, Governor Walz signed Emergency Executive Order 21-17 declaring a peacetime emergency in the wake of the killing of Daunte Wright and ordering "state agencies, in cooperation with appropriate federal agencies, to assist local units of government as they respond to and recover from this emergency."

16.     Also on April 12, 2021, Governor Walz signed Emergency Executive Order 21-18.  It imposed a curfew on all public areas within Anoka, Dakota, Hennepin and Ramsey counties from 7:00 p.m. on April 12 until 6:00 a.m. on April 13.  The Order specifically exempted "members of the news media" from the curfew.

## DEFENDANTS' UNCONSTITUTIONAL CONDUCT DURING THE GEORGE FLOYD PROTESTS

17.     The Minnesota State Patrol has a custom and practice of unconstitutional use of force against journalists, as demonstrated by its conduct during both the George Floyd and Daunte Wright protests.

18.     During the George Floyd protests, the Minnesota State Patrol assaulted numerous journalists who were clearly identifiable at the time as members of the press.

19.     The unconstitutional conduct included an incident on May 30, 2020, when Minnesota State Patrol troopers attacked a clearly identifiable cluster of journalists near

the Minneapolis Police Department's Fifth Precinct building, firing concussion grenades, 40mm rounds, and deploying pepper spray in a targeted fashion against members of the press, including NBC photojournalist Ed Ou, New York Times journalist Katie Nelson, and Los Angeles Times reporters Molly Hennessy-Fiske and Carolyn Cole, among others.

20.     Below is a picture of Ed Ou after being hit by a concussion grenade thrown by Minnesota State Patrol troopers on May 30, 2020:



21.     Similarly, below is a photograph of the injuries Molly Hennessy-Fiske suffered after being shot by 40mm rounds fired by the Minnesota State Patrol:



22.   And below is a screenshot of Minnesota State Patrol troopers deploying pepper spray against clearly identifiable journalists during the May 30 incident:



23.     The May 30 incident was just one of many involving journalists and the Minnesota State Patrol during the George Floyd protests.  WCCO cameraman Tom Aviles was shot at with 40mm weapons, tackled and arrested by troopers despite being clearly identifiable as a member of the press.  CNN reporter Omar Jimenez and his entire camera crew were arrested live on national television by Minnesota State Patrol troopers in a notorious incident that received international media attention and for which Governor Walz specifically apologized during a news conference.   And there were other incidents involving unlawful arrest and use of force.  On information and belief, no troopers have been disciplined for their unconstitutional conduct during the George Floyd Protests.

24.     Several lawsuits were filed against the Minnesota State Patrol based on this unconstitutional conduct during the George Floyd protests.  On June 2, 2020, the complaint in *Goyette, et. al v. City of Minneapolis, et al.*, Case No. 20-cv-1302 (WMW/DTS) was filed in the District of Minnesota alleging constitutional violations by the Minnesota State

Patrol against journalists covering the George Floyd protests, including journalists injured during the May 30, 2020 incident.  On May 25, 2021, a separate lawsuit was filed in the District of Minnesota by journalists Molly Hennessy-Fiske and Carolyn Cole against certain John Doe troopers for the unconstitutional attack they suffered during the May 30 incident.  *See Cole, et. al v. Does, et al.*, Case No. 21-cv-1282 (PJS/JFD).

25.     Defendants Harrington, Langer, and Dwyer planned, commanded, and led the State Patrol's response to the George Floyd protests.  Defendant Dwyer was in the field, in command of the Mobile Response Team during the protests, personally providing direction to troopers and receiving orders from Langer and Harrington, including the orders that lead to the unconstitutional use of force against journalists on May 30.  All three defendants were aware of the unconstitutional conduct of troopers during the protests as they monitored the protest response in real time.

26.     The State Patrol's rampant unconstitutional conduct toward journalists, and the lack any effective remedial training or discipline, demonstrates that the State Patrol had a custom or policy of violating journalists' constitutional rights through the use of less-lethal weapons and other crowd dispersal techniques.

## DEFENDANTS' UNCONSTITUTIONAL CONDUCT DURING THE DAUNTE WRIGHT PROTESTS

27.     Given the failure to take corrective action in the wake of the George Floyd protests, it is unsurprising that the unconstitutional conduct by the Minnesota State Patrol repeated itself during the Daunte Wright protests.  Numerous journalists were arrested or subjected to unlawful use of force during the Daunte Wright protests.  These attacks

confirm that whatever training was provided in the wake of the George Floyd protests was wholly inadequate, and the lack of any discipline or other corrective action toward troopers who engaged in unconstitutional conduct during the George Floyd protests signaled to troopers that the Minnesota State Patrol and Department of Public Safety did not object to or take issue with the unconstitutional conduct in which troopers engaged during the George Floyd protests.

28.    For example, On April 12, 2021, freelance journalist Josh McFadden was covering the protests at the Brooklyn Center police station on assignment with the New York Times.  Around midnight, McFadden was standing with a group of other journalists near the police station when law enforcement shot him in the left thigh with a projectile. The projectile burned a hole roughly four inches wide in his pants and left a powdery substance and brown singe marks on the fabric.  The projectile badly bruised his leg. McFadden was hit with other less-lethal munitions that evening, and when he returned home and removed his helmet, he saw a mark from less-lethal munitions there.  McFadden was clearly identifiable as a member of the press when he was hit.  He was among a group of journalists, and they were all carrying large professional cameras.[1]

29.    Also on April 12, 2021, Star Tribune photographer Carlos Gonzalez was documenting the protests.  He was clearly identifiable as a member of the press, was carrying his standard press pass and a large yellow PRESS card and was operating a professional camera at the time.  Video footage captured by Gonzalez's GoPro camera

---

[1] https://pressfreedomtracker.us/all-incidents/photojournalist-on-assignment-for-new-york-times-hit-with-projectiles-while-covering-brooklyn-center-protest/

shows a Minnesota Trooper gratuitously directing pepper spray straight at Gonzalez's face even though Gonzalez was clearly a member of the press, was not obstructing or impeding anyone, and posed no threat to law enforcement.[2]  The pepper spray caused Gonzalez significant pain and he had to leave the protests. Gonzalez stated, "it was obvious that I wasn't agitating anyone, that I was documenting and not part of the protest."[3]

30.     On April 12, 2021, Aaron Nesheim, a freelance photojournalist was reporting on the protests on assignment for the New York Times.  A Minnesota State Trooper saw Nesheim photographing the protests with his professional camera, then lunged forward and pepper sprayed Nesheim directly in the face.  Nesheim was wearing both a helmet and body armor vest labeled with "PRESS" on multiple sides, as well as press credentials issued by the New York Times and National Press Photographers Association. [4]

31.     On April 13, 2021, State Troopers in full riot gear attacked foreign reporter Adam Gray and shoved him into the grass despite his pleas that he was a member of the press trying to return to his car.  Troopers ziptied his hands while he was face-down in the grass before rolling him over and standing him up.  They then arrested him, took him to a patrol car and issued him a citation.  At the time, Gray was reporting for the United Kingdom-based South West News Service.  He was clearly identifiable as a member of the

---

[2] https://twitter.com/CarlosGphoto/status/1381794769182023682
[3] https://pressfreedomtracker.us/all-incidents/minneapolis-star-tribune-photojournalist-pepper-sprayed-while-documenting-protests-in-brooklyn-center/
[44] https://pressfreedomtracker.us/all-incidents/photojournalist-for-new-york-times-targeted-with-pepper-spray-at-brooklyn-center-protest/

press, carrying two large professional cameras in addition to press credentials issued by the New York City Police Department.[5]

32.      As a result of the Minnesota State Patrol's ongoing unconstitutional conduct in these and other incidents during the Daunte Wright protests, U.S. District Judge Wilhelmina Wright issued a temporary restraining order on April 16, 2021, barring the State Patrol from additional unconstitutional conduct against journalists.

## DEFENDANTS HARRINGTON'S, LANGER'S, AND DWYER'S PERSONAL INVOLVEMENT IN THE VIOLATIONS

33.      The State Patrol, under the command of Harrington and Langer, made no meaningful changes in its policies and practices with respect to treatment of journalists in the year between the George Floyd protests and the Daunte Wright protests.

34.      Nor did the Department of Public Safety, under Harrington's command, even investigate misconduct that came to its attention during and after the George Floyd protests, unless it was the subject of a formal third-party complaint.

35.      Harrington personally supervises Langer and knew of Langer's failure to provide adequate additional training to troopers regarding the First Amendment rights of journalists, as well as Langer's failure to investigate, discipline, or refer for an internal affairs investigation any of the troopers involved in unconstitutional conduct during the George Floyd protests, or any of the supervisors of those troopers (who were themselves personally supervised by Langer).

---

[5] https://pressfreedomtracker.us/all-incidents/photographer-arrested-cited-while-covering-brooklyn-center-protests/

36.     For example, Harrington testified in the *Goyette* matter that while he was aware of the on-camera arrest of Omar Jimenez, which drew global condemnation, which Harrington admitted he found concerning, and for which Governor Walz was forced to take to the airwaves to apologize, neither Harrington nor anyone else at the Department of Public Safety initiated an investigation or otherwise followed-up on the blatantly unconstitutional conduct because CNN never filed a formal complaint with the agency.

37.     In those instances where complaints were filed, the internal affairs process was ineffective in investigating allegations of misconduct and initiating corrective action at the State Patrol.  For example, Molly Hennessy-Fiske, one of the reporters injured in the May 30 attack on journalists by the State Patrol filed a complaint regarding that misconduct on May 31, 2020 – the day after the incident.  On November 24, 2020, Ms. Hennessy-Fiske tweeted: "Update: @MnDPS_MSP illegally attacked me and other journalists six months ago and has yet to apologize/take corrective action.  #Minnesota is still investigating my complaint and has refused to supply public records showing who attacked us and what they've done to investigate."[6]  At the time of the Daunte Wright protests, Harrington and Langer were both aware of Hennessy-Fiske's complaint and the lack of any action to address that complaint.

38.     On information and belief, to date no trooper has been disciplined for the attacks on Hennessy-Fisk, Cole, or any of the other journalists assaulted on May 30, and

---

[6] https://twitter.com/mollyhf/status/1331340407234588677

Defendants Harrington and Langer are aware of the lack of corrective action and have done nothing to remedy it, despite their positions as chief policymakers at the State Patrol.

39.    The Minnesota State Patrol troopers responding to the Daunte Wright protests operated under the personal supervision and direction of Commissioner Harrington and Colonel Langer.   Both Harrington and Langer were personally involved in creating, applying, and interpreting the State Patrol policies and practices that gave rise to Vancleave's injury.   Both Harrington and Langer personally review and approve the relevant DPS and State Patrol policies on an annual basis.

40.    Both Harrington and Langer were directly, personally involved in creating, developing, and providing training to Minnesota State Patrol troopers and their supervisors, including John Does 1-4, and personally supervised others who provided such training. Conversely, both Harrington and Langer were also personally involved in the decision not to discipline or initiate investigations of troopers involved in the unconstitutional conduct during the George Floyd protests, or to develop specific training that would have averted the unconstitutional conduct described herein, despite both being aware of troopers' unconstitutional conduct during the George Floyd protests.

41.    Both Harrington and Langer monitored the Daunte Wright protests and law enforcement response in real-time, providing instructions to subordinates and engaging in strategical and tactical decision-making regarding the protest response, providing directives to be conveyed to troopers at their briefings before deploying to engage in crowd control activities, and directly authorizing the use of force that led to Vancleave's injuries. Both Harrington and Langer demonstrated their awareness of and active participation in

the law enforcement response to the Daunte Wright protests during nightly news conferences in which they provided substantive briefings on the protests and the responses, and the related operational planning and instructions provided to subordinates.

42.    OSN used a real-time data-sharing tool called Intrepid Response, which is sold on a subscription basis by AT&T and has been described as "Slack for SWAT."  It allowed the real time sharing of images, video (including footage captured by drones), geolocations of team members and targets, and other data among officers and command staff.  Defendants Harrington, Langer, and Dwyer received information from Intrepid Response in real time to assess protest conditions and adjust the law enforcement response accordingly, which informed their decisions regarding authorization of use of force.  Because of their real time monitoring of the protest response, Harrington, Langer, and Dwyer knew that force was being used against protesters and journalists alike, in contravention of the First and Fourth Amendments.  This was also true during the George Floyd protests, where Harrington and Langer monitored events in real time and provided operational directions to the troopers and their supervisors who engaged in unconstitutional conduct during those protests.

43.    Dwyer was in command of the Mobile Response Team during the Daunte Wright protests, and personally supervised John Does 1-4 during those protests.  Dwyer personally provided training to the Mobile Response Team and other troopers regarding crowd dispersal, use of less-lethal weapons, and the First Amendment, in the weeks, months and years prior to the Daunte Wright protests, and such training was woefully

deficient as described herein and as evidenced by the repeated misconduct engaged in by Dwyer's supervisees.

44.     As the on-the-ground commander at the Daunte Wright protests, Major Dwyer assessed the crowd and made personal, individual determinations of what force to use where, when, and against whom, guided by the orders and force authorizations he received from Harrington and Langer.  Dwyer also personally participated in operational planning for the Daunte Wright protests, including decisions regarding the specific movements, tactics, and less-lethal weapons to be used against protesters and journalists, and he personally provided the commands regarding deployment and use of force to John Does 1-4 that resulted in the unconstitutional conduct against Plaintiff on April 12, 2021.

45.     The numerous incidents involving unconstitutional use of force toward, and arrest of, journalists during the George Floyd and Daunte Wright protests, and Defendants Harrington's, Langer's, and Dwyer's failure to take corrective steps in the wake of the misconduct during the George Floyd protests, demonstrates the their malice toward the press and hostility to the First Amendment, and reflects Defendants Harrington's, Langer's, and Dwyer's failure to train, supervise, and intervene to prevent unconstitutional conduct by State Patrol troopers.

## DEFENDANTS' UNCONSTITUTIONAL CONDUCT TOWARD VANCLEAVE

46.     On April 12, 2021, Vancleave was covering the Daunte Wright protests in Brooklyn Center for his employer, the Star Tribune.  Vancleave arrived at the protest site

– the Brooklyn Center Police Department – in the mid-afternoon.  The protests were organized and peaceful.

47.     When the curfew went into effect, the situation became confrontational.  Law enforcement, including the Minnesota State Patrol, deployed in full riot gear, indiscriminately pepper spraying protesters and firing less-lethal weapons into the crowd.

48.     State Troopers told Vancleave and a journalist colleague to move to a "media staging area" across the street from the police department.  Vancleave and his colleague complied with this request.

49.     Vancleave continued to document the protests and law enforcement response from this "staging area" designated by the State Patrol.  He was clearly identifiable as a journalist due to his large professional camera gear, including a large camera with a microphone mounted on it he was using to take pictures at that time, as well as his press badge, his conduct (documenting the protests and not participating in them), and the fact that he was standing next to another journalist who was also documenting the protest with a large, shoulder mounted camera.

50.     While Vancleave and his colleague filmed the protests and a line of Minnesota State Patrol troopers in riot gear about 50 feet away, they could hear "pops" from less-lethal weapons being fired at them and the 40mm rounds whizzing past.

51.     There were only a handful of protesters within 10 feet of Vancleave and his colleague, and those protesters were holding signs and chanting – not engaging in violence. One protester was banging on a small hand drum.

52.     Several State Patrol troopers equipped with and firing 40mm weapons were positioned in the front of line of State Patrol Troopers in riot gear.  One of these troopers, John Doe 1, targeted Vancleave and shot him in the hand with a 40mm less-lethal round.

53.     Below is a photograph Vancleave took just moments before being shot that depicts the line of State Troopers with several individual troopers on their knees wielding 40mm weapons:



54.     At the time he was shot, Vancleave was clearly identifiable as a member of the press and not engaged in any protest activity, let alone any riotous activity.  In fact, the 40mm round hit Vancleave directly in the hand that was holding his professional camera, which would have been visible to the Trooper who fired the round.

18

55.   Vancleave's colleague, who was right next to him, was also clearly identifiable as a member of the press, as he was also holding a large professional shoulder-mounted camera.

56.   Even if Vancleave had not been clearly identifiable as a member of the press, Defendants' use of less-lethal weapons against him would have been unreasonable, as he was simply standing still and documenting the protests, and obviously posing no threat to any person or property.

57.   Dwyer and John Does 2-4 were the supervising Troopers and/or Officers in the field with direct supervisory responsibility over John Doe 1.  Dwyer and John Does 2-4 implemented the operational plan regarding protest response initiated and developed by Harrington, Langer, and others.  Dwyer and John Does 2-4 gave the orders to assemble Troopers in a line to ultimately advance toward the protesters (and Plaintiff), positioned the troopers with less-lethal weapons, and gave orders to fire less-lethal weapons at non-violent protesters and others, including Plaintiff, in the course of implementing the operational plan.

58.   Each of Dwyer and John Does 2-4 personally observed John Doe 1 firing his less-lethal weapon at non-violent protesters as well as at Plaintiff and did not intervene to stop John Doe 1's excessive use of force or take any other corrective action.

59.   At all times relevant to the use of force against Vancleave, John Doe 1 acted with the approval and at the direction of Dwyer and John Does 2-4.

60.     The week prior to the Daunte Wright protests, Star Tribune journalists and editors participated in a conference call with representatives of the State Patrol to discuss how law enforcement would respond to protests anticipated at the conclusion of the Derek Chauvin trial, which was underway at that time.

61.     During this conference call, State Patrol representatives acknowledged that reporters might not always have their press credentials visible, and that represented that troopers knew to identify members of the press by their use of professional recording equipment and their conduct (clearly documenting protests and not participating in the protests or otherwise antagonizing law enforcement) – the exact circumstances under which Vancleave was shot.  Left unsaid during this call was that troopers also knew there would be no consequences for the unconstitutional use of force or arrest of journalists, as none had been meted out after the George Floyd protests, and that in fact the leaders and supervisors at the State Patrol, including Defendants Harrington, Langer, Dwyer, and John Does 2-4, sanctioned and encouraged such unconstitutional conduct.

62.     At the time Vancleave was shot, Defendants knew full well that use of crowd control weapons against journalists violated the First Amendment, as multiple lawsuits had been filed against the Minnesota Department of Public Safety, including *Goyette, et al., vs. City of Minneapolis*, Case No. 20-cv-01302, and *Cole, et al. v. Does, et al.*, Case No. 21-cv-02182.

63.     The impact of the 40mm round knocked Vancleave's camera out of his hand. His hand immediately went numb, and he went into shock.

64.     Vancleave's colleague walked him behind a nearby apartment building, out of sight of the State Patrol.  When Vancleave pulled off his glove, he could see his middle finger was no longer straight.  The 40mm round had lacerated both his ring and middle finger, and they were bleeding.  He was immediately concerned (accurately as it turned out) that his fingers were broken.

65.     Below is a photograph of Vancleave's injury taken at North Memorial Hospital:



66.     A protest medic wrapped an improvised bandage around Vancleave's finger, and several journalist colleagues drove Vancleave to the ER at North Memorial Hospital.

As the shock wore off, Vancleave's pain accelerated to an almost intolerable level, and he sat for several hours in agony before finally being seen by an ER physician.

67.    The ER physician told Vancleave he had two open, unstable fractures in his hand, that he would need surgery, and that because of the open nature of the fractures, there was some risk of infection.  So Vancleave was admitted to the hospital.

68.    Below is an x-ray showing the clearly visible fractures:



69.     Vancleave was not allowed to eat or drink anything after admission, with the expectation he would undergo hand surgery the following morning.   Unfortunately the surgery was delayed until around 4pm the following day, which resulted in Vancleave having to fast for almost 24 hours.

70.     Vancleave's surgeon straightened his middle finger and drilled a metal pin down the length of the finger to stabilize the fractures and hold the finger immobile while the fractures healed:



71.     After surgery, Vancleave's finger was extremely sore.  He took opioid pain medication for several weeks before ultimately weaning himself off the opioids and onto a Tylenol/Ibuprofen regimen that provided only minimal pain relief.

72.     Vancleave had several days off of work after the surgery but then had to return.  He was unable to work in the field given his condition, so he stayed on desk duty, coordinating other Star Tribune photographers during the conclusion and aftermath of the Chauvin trial.  Because of this injury, Vancleave was denied the opportunity to cover and report on the Chauvin verdict – one of the most significant events in the history of Minnesota, and an event that was so noteworthy it received news coverage around the world.  The experience was deeply frustrating for Vancleave and represented a significant lost opportunity to advance his career.

73.     Vancleave's whole hand was immobilized for several weeks after the surgery in a hard splint and bandages.  Below is a picture of the splint and a picture of the fully bandaged hand:





74.     The pain, immobility, and bandaged splint made ordinary day-to-day tasks like showering, cooking, driving, and walking the dog extremely challenging if not impossible.  Once, Vancleave had to pull over while driving because the pain in his hand was so debilitating, he could not safely continue down the road.  Vancleave could not type or operate a camera for months, which limited what he could do for work at the Star Tribune.  The feelings of helplessness and frustration during this time sent Vancleave into a depression.

75.     On May 12, Vancleave's surgeon removed the pin from his finger.  He continued to experience serious pain until the end of June.  Anytime Vancleave's finger made contact with another object, he experienced an extreme shock of pain.  It was not until August that his finger sensitivity finally returned to a relatively normal state.

76.     Vancleave began physical therapy on his finger in May and continued to see a physical therapist for 2 hours per week until September 2021.

77.     Vancleave was able to recover about half the range of movement in his middle finger joint through intensive physical therapy, but essentially none in the terminal joint, leaving him with a permanently damaged and partially immobile finger.

78.     Because Vancleave is right-handed, this permanent damage has directly impacted his daily life.  He continues to experience periodic stiffness and soreness in the finger, and occasionally takes ibuprofen to blunt the pain.  He has lost some of his fine motor control, which makes it harder to hold and use knives and cooking utensils, to hold his phone, and to operate the buttons on his camera.  When it gets cold, Vancleave's finger stiffens, making it hard to hold his phone or operate the buttons on the cameras that he

27

uses.  After holding his camera for long period – something that occurs regularly in his job – Vancleave's finger gets especially sore.   Vancleave's hobbies used to include rock climbing, but the immobility and pain in his finger prevents him from enjoying this hobby anymore.

79.     Vancleave's scars are not just physical.  Being shot by law enforcement deeply traumatized Vancleave.  He worries now about his personal safety when reporting around law enforcement.  His anxiety during reporting on the Kim Potter trial became so acute that he could not sleep.

80.     The State Patrol's unconstitutional conduct against Vancleave would chill a person of ordinary firmness and has in fact chilled Vancleave's exercise of his First Amendment rights.

## CAUSES OF ACTION

### COUNT I:
### FIRST AND FOURTEENTH AMENDMENTS
### FREEDOM OF SPEECH AND THE PRESS, 42 U.S.C. § 1983
### *DEFENDANT JOHN DOE 1*

81.     Plaintiff restates and realleges all previous paragraphs of this Complaint.

82.     Plaintiff engaged in constitutionally protected acts of journalism on April 12, 2021.

83.     John Doe 1, at all times acting under color of law, used unlawful use of force to curb Plaintiff's exercise of his First Amendment rights.

84.     The actions of John Doe 1 were willful, malicious and in violation of the known rights of Plaintiff.

85.     Alternatively, John Doe 1 acted with reckless disregard for the constitutional rights of Plaintiff.

86.     Plaintiff suffered permanent physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Doe 1's violations of his constitutional rights.

87.     Punitive damages in an amount to be determined by the jury are available against John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

88.     Defendants are jointly and severally liable to Plaintiff.

**COUNT II:**
**FIRST AND FOURTEENTH AMENDMENTS**
**RETALIATION, 42 U.S.C. § 1983**
***DEFENDANT JOHN DOE 1***

89.     Plaintiff restates and realleges all previous paragraphs of this Complaint.

90.     Plaintiff engaged in constitutionally protected acts of journalism on April 12, 2021.  Plaintiff will continue to do so in the future.

91.     John Doe 1's use of less-lethal weapons against Plaintiff, for no legitimate law enforcement reason, was retaliation for Plaintiff's exercise of his First Amendment rights.

92.     The actions of John Doe 1 were willful, malicious and in violation of the known rights of Plaintiff.

93.     Alternatively, John Doe 1 acted with reckless and deliberate indifference to the constitutional rights of Plaintiff.

94.     Plaintiff reasonably fears the continued use of excessive force against him if he continues to engage in constitutionally protected activity.

95.     John Doe 1's acts would chill a person of reasonable firmness from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to engage in constitutionally protected journalism.

96.     The injuries Plaintiff suffered due to John Doe 1's use of excessive force actually prevented Plaintiff from exercising his First Amendment rights.

97.     Plaintiff suffered permanent physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Doe 1's violations of his constitutional rights.

98.     Punitive damages in an amount to be determined by the jury are available against John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

99.     Defendants are jointly and severally liable to Plaintiff.

## COUNT III:
## FOURTH AND FOURTEENTH AMENDMENT
## UNREASONABLE FORCE, 42 U.S.C. § 1983
### *DEFENDANT JOHN DOE 1*

100.    Plaintiff restates and realleges all previous paragraphs of this Complaint.

30

101.   By the actions described above, John Doe 1 violated and deprived Plaintiff of his clearly established and well-settled right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

102.   John Doe 1 was acting under color of law when he violated Plaintiff's Fourth and Fourteenth Amendment rights.

103.   John Doe 1's actions were willful, malicious and in violation of the known rights of Plaintiff.

104.   Alternatively, John Doe 1 acted with reckless and deliberate indifference to Plaintiff's constitutional rights.

105.   John Doe 1 committed these acts without forewarning and, as a result, his acts were objectively unreasonable.

106.   Plaintiff did not pose a threat to any of law enforcement officers or agents or any other person.

107.   Plaintiff suffered permanent physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Doe 1's violations of his constitutional rights.

108.   Punitive damages in an amount to be determined by the jury are available against John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

109.   Defendants are jointly and severally liable to Plaintiff.

## COUNT IV:
## 42 U.S.C. § 1983 - SUPERVISORY LIABILITY
### *DEFENDANTS HARRINGTON AND LANGER (INDIVIDUAL CAPACITY)*

110.   Plaintiff restates and realleges all previous paragraphs of this Complaint.

111.   At all times relevant, Harrington and Langer had supervisory responsibility and authority over John Does 1-4.

112.   Harrington and Langer's failure to train and supervise their supervisees, employees and agents, including John Does 1-4, and failure to issue corrective instructions after violations were brought to light, caused John Does 1-4 to violate the First Amendment rights of Plaintiff.

113.   Harrington's and Langer's failure to supervise and train their supervisees, employees and agents, including John Does 1-4, with respect to the First Amendment rights of Plaintiff, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiff.

114.   The State Patrol's need for more supervision or training with respect to the First Amendment was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Harrington and Langer demonstrated their reckless and deliberate indifference to the need for such training and supervision in failing to provide it.

115.   Harrington and Langer's failure to train and supervise their supervisees, employees and agents, including John Does 1-4, and failure to issue corrective instructions after violations were brought to light, caused John Does 1-4 to violate the Fourth Amendment rights of Plaintiff.

32

116.    Harrington's and Langer's failure to supervise and train their supervisees, employees and agents, including John Does 1-4, with respect to the Fourth Amendment rights of Plaintiff, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiff.

117.    Alternatively, Harrington and Langer's failure to provide the State Patrol with adequate supervision and training with respect to the First and Fourth Amendments constituted gross negligence.

118.    Harrington and Langer personally directed and authorized the use of force that led to the injuries suffered by Plaintiff.

119.    Plaintiff suffered physical injury, great pain and suffering, and emotional trauma and distress as a direct and proximate result of Harrington and Langer's failure to adequately supervise and train their employees and agents, including John Does 1-4, and their authorization of the use of force that resulted in his injury.

120.    Punitive damages in an amount to be determined by the jury are available against Harrington and Langer and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

121.    Defendants are jointly and severally liable to Plaintiff.

## COUNT V:
### 42 U.S.C. § 1983 – SUPERVISORY LIABILITY
### *DEFENDANT MAJOR JOSEPH DWYER*

122.    Plaintiff restates and realleges all previous paragraphs of this Complaint.

123.   Defendant Dwyer at all times material hereto was a member of the State Patrol with supervisory responsibility over John Does 1-4.

124.   By the actions described above, Dwyer, acting under color of state law, observed or intended the use of excessive force set forth in Count III, and did not intervene to halt it or take other corrective action.

125.   By the actions described above, Dwyer, acting under color of state law, observed or intended the violation of Plaintiff's First Amendment rights set forth in Counts I and II, and did not intervene to halt it or take corrective action.

126.   Dwyer observed, and had the realistic opportunity to prevent, John Doe 1's use of unlawful levels of force against Plaintiff while Plaintiff was physically separated from the protest activity in the area and engaged in the constitutionally protected activity of covering the Daunte Wright protests and the police response to the protests. Yet, Dwyer failed to intervene and prevent the assault.

127.   Dwyer issued orders allowing John Doe 1 to violate Plaintiff's First Amendment rights.

128.   Dwyer issued orders allowing John Doe 1 to use excessive force against Plaintiff in violation of the Fourth Amendment.

129.   The coordinated line of assembled State Troopers depicted above, and the positioning of individual Troopers firing 40mm "less-lethal" weapons at Plaintiff – despite his being clearly identifiable as a member of the press, and having been specifically instructed by the State Patrol to move to the location he was shot – made it clear that the

use of the less-lethal weapons was planned and that Dwyer not only had notice of but sanctioned the unconstitutional conduct of John Doe 1.

130.    Plaintiff suffered physical injury, great pain and suffering, and emotional trauma and distress as a direct and proximate result of the acts and omissions of Defendant Dwyer.

131.    Punitive damages in an amount to be determined by the jury are available against Dwyer and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

132.    Defendants are jointly and severally liable to Plaintiff.

**COUNT VI:**
**42 U.S.C. § 1983 – SUPERVISORY LIABILITY**
***DEFENDANTS JOHN DOES 2-4***

133.    Plaintiff restates and realleges all previous paragraphs of this Complaint.

134.    Defendants John Does 2-4 at all times material hereto were members of the State Patrol with supervisory responsibility over John Doe 1.

135.    By the actions described above, John Does 2-4, acting under color of state law, observed or intended the use of excessive force set forth in Count III, and none intervened to halt it or take other corrective action.

136.    By the actions described above, John Does 2-4, acting under color of state law, observed or intended the violation of Plaintiff's First Amendment rights set forth in Counts I and II, and none intervened to halt it or take corrective action.

137.    Each of John Does 2-4 observed, and had the realistic opportunity to prevent, John Doe 1's use of unlawful levels of force against Plaintiff while Plaintiff was physically separated from the protest activity in the area and engaged in the constitutionally protected activity of covering the Daunte Wright protests and the police response to the protests. Yet, John Does 2-4 failed to intervene and prevent the assault.

138.    John Does 2-4 issued orders allowing John Doe 1 to violate Plaintiff's First Amendment rights.

139.    John Does 2-4 issued orders allowing John Doe 1 to use excessive force against Plaintiff in violation of the Fourth Amendment.

140.    The coordinated line of assembled State Troopers depicted above, and the positioning of individual Troopers firing 40mm "less-lethal" weapons at Plaintiff – despite his being clearly identifiable as a member of the press, and having been specifically instructed by the State Patrol to move to the location he was shot – made it clear that the use of the less-lethal weapons was planned and that John Does 2-4 not only had notice of but sanctioned the unconstitutional conduct of John Doe 1.

141.    Plaintiff suffered physical injury, great pain and suffering, and emotional trauma and distress as a direct and proximate result of the acts and omissions of John Does 2-4.

142.    Punitive damages in an amount to be determined by the jury are available against John Does 2-4 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

143.    Defendants are jointly and severally liable to Plaintiff.

**COUNT VII:**
**FAILURE TO INTERVENE, 42 U.S.C. § 1983**

144.    Plaintiff restates and realleges all previous paragraphs of this Complaint.

145.    During the constitutional violations described in this Complaint, including the firing of less-lethal weapons at Plaintiff while he exercised his First Amendment rights, Major Dwyer, John Does 2-4, Colonel Langer, and Commissioner Harrington ("the Supervisory Defendants"), stood by without intervening to prevent the misconduct.

146.    The Supervisory Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

147.    The Supervisory Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

148.    The Supervisory Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

149.    The Supervisory Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiff when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

150.    The misconduct described in this Complaint was undertaken under color of state law, and the Supervisory Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

151.    Punitive damages in an amount to be determined by the jury are available against Supervisory Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

152.    Defendants are jointly and severally liable to Plaintiff.

**COUNT VIII:**
**42 U.S.C. § 1983 - FIRST AND FOURTH AMENDMENT**
***DEFENDANTS HARRINGTON AND LANGER (OFFICIAL CAPACITY CLAIMS)***

153.    Plaintiff restates and realleges all previous paragraphs of this Complaint.

154.    It was the DPS's and State Patrol's ("State Defendants") customs and policies of allowing and encouraging constitutional violations against journalists, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, which caused the excessive use of force against Plaintiff and violation of his First Amendment rights.

155.    The State Defendants' failure to supervise and train their employees and agents with respect to Plaintiff's First and Fourth Amendment rights, including a failure to investigate and discipline officers for First and Fourth Amendment violations against other journalists, amounts to deliberate indifference to the Plaintiff's rights,

156.    The pattern of similar constitutional violations against journalists that occurred during the George Floyd protests demonstrates the deliberate indifference of the State Defendants to Plaintiff's rights.

157.    Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the

inadequacy of the training and supervision so likely to result in additional violation of constitutional rights, including Plaintiff's rights, that the State Defendants demonstrated their deliberate indifference to the need for such training and supervision.

158.   Further, the excessive and unlawful use of force against journalists was so widespread, well-known, and obvious to State Defendants, that State Defendants' continued use of excessive force against journalists, including Plaintiff, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to Plaintiff's rights.

159.   As a direct and proximate result of State Defendants' violations of Plaintiff's constitutional rights, Plaintiff suffered physical injury and emotional and mental distress.

160.   Plaintiff intends to continue to observe, record, and participate in constitutionally protected activity in Minnesota, including in his professional capacity as a photojournalist.

161.   Plaintiff reasonably fears further retaliation in the future in violation of the First and Fourth Amendments if he continues to observe, record, or participate in constitutionally protected activity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.   A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

B.   An injunction barring further unconstitutional conduct and requiring adequate training and discipline of Minnesota State Patrol troopers;

C.      Damages compensating Plaintiff for his injuries, pain and suffering, and emotional distress, including but not limited to compensatory, pecuniary, and medical expense damages;

D.      Punitive damages;

E.      An award of pre-judgment interest;

F.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.      An award of such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated: November 3, 2022          */s/ Kevin C. Riach*
_____
Kevin C. Riach (#0389277)
**THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
Telephone: (612) 203-8555
kevin@riachdefense.com

***ATTORNEY FOR PLAINTIFF***